10871

SOUTHERN RAILWAY CO. v. S. C. LIGHT, POWER & RYS. CO.

(112 S. E. 75)

1. Street Railroads—Permission to Cross Other Railroad Consid-
eration for Agreement to Pay Portion or Expense of Flagman.—
The granting by a railroad to a street railroad company of per-
mission to cross the right of way of the former is sufficient con-
sideration for a contract whereby the street railroad company
agreed to pay one-half the expense of maintaining a flagman, or
lights at the crossing, if they were required 'by city ordinance, even
though the railroad did not own the fee of the right of way.

2. Street Railroads—Contract Held not to Require Street Rail-
road to Pay Portion of Salary of Gateman at Crossing.—A con-
tract whereby a street railroad company agreed to pay one-half
the expense of maintaining lights or a flagman at a railroad cross-
ing, if a city ordinance required a railroad company to maintain
such safeguards, does not require the street railroad to pay one-
half of the wages of a gateman who operated the gates at the
crossing, which the railroad was required by city ordinance to in-
stall, but who merely lowered and raised the gates on the approach
and passing of trains, and gave no signals to the street cars, which
were still required to be flagged by their conductors.

Before Towsend, J., Spartanburg, 1921.   Reversed.

Action by Southern Railway Co. against South Carolina
Light, Power and Railways Co.   From directed verdict for
plaintiff the defendant appeals.

*Messrs. Carson & Tinsley,* for appellant cite: *Street Rail-
way has right of eminent domain across track of steam
railroad*: Lewis Em. Dom. Sec. 180; 36 S. E. 873. *No con-
sideration for contract*: Elliott Conts., Sec. 234, 215.
*Construction by parties will be adopted*: Elliott Conts.,
Secs. 1537, 1542; 34 Fed. 254. *Waiver for the jury*: 107 S.
C. 396; 88 S. C. 221:

Note: On right of railroad company to compensation for the crossing
of its track where it intersects a street or highway, by an electric road,
see notes in 29 L R. A. 485; 13 L. R. A. (N. S.) 916, and L. R. A.
1915D, 843.

*Mr. J. B. Atkinson,* for respondent, cites: *One railroad cannot appropriate right of way of another railroad without compensation*: 15 Cyc. 669; 18 S. E. 305. *Cost of signals element of damage*: 15 Cyc. 699. *Mutual contract with mutual benefits, is not without consideration*: 22 S. C. 371; 13 C. J. 330, Sec. 178; 9 Cyc. 312; 3 Hill 41. *Ordinance carried out intention of parties*: 70 S. E. 747; 56 S. E. 189; 95 S. C. 36. *Construction of contract*: 81 S. E. 1096; 68 S. E. 915; 9 Cyc. 578. *Waiver*: 53 S. C. 701; 9 Rich. L. 374; 2 Bail. 51; 68 S. C. 35. *Laches*: 68 S. C. 35. *Directed verdict*: 68 S. C. 184.

March 18, 1922.

The opinion of the Court was delivered by Mr. Justice Fraser. .

This is an action based upon a contract.

The Southern Railway has a track that crosses Main street in the city of Spartanburg. The city of Spartanburg granted to the Spartanburg Railway, Gas & Electric Company the right to construct and operate a line of street cars in said street that crossed the said track of the Southern Railway. These two companies made a contract as to the crossing. The appellant is the successor of the Spartanburg Gas & Electric Company. The clause of the contract that gives rise to this action reads as follows:

"And it is mutually covenanted and agreed: That, in the event that the city council of Spartanburg should, at any time hereafter by lawful ordinance, require the maintenance of electric lights and a flagman at said crossing of the tracts of the parties thereto, then the expense in that respect shall be borne by and equally divided between the parties hereto."

The following is the ordinance:

"That in order to provide for the safety of the public at certain places in the city of Spartanburg where the tracks

of steam railroad companies cross the streets of said city, it shall be the duty of the railway companies so crossing said streets, respectively, to erect, maintain and operate at said crossings suitable and proper gates for the protection of the public, as follows, to wit: By the Southern Railway Company at its crossing of East Main street and of Magnolia street at its passenger station. By the Charleston & Western Carolina Railway Company at its crossing of West Main street and its passenger station. That this ordinance shall go into effect on and after the 15th day of April, 1903, and the said railway companies mentioned in section of this ordinance respectively be, and they are, required on and after said date to erect, maintain, and keep in operation gates as provided in said section."

The agreed statement of facts is:

"Execution of contract admitted. Ordinance admitted. That the first demand that was ever made upon the street railway by Southern Railway for contribution for labor by gateman was September 14, 1915. Street railway refused payment and has never paid anything. That the gates were constructed and operated by the Southern Railway Company in obedience to ordinances of the city council for 16 years, at a monthly cost of $30. The gates are operated from a tower on the right of way of Southern Railway on the northwest side of Main street, beyond the pavement. The gateman is on duty from about 7 o'clock in the morning until about 6 o'clock in the afternoon. The gates are not operated between the hours of 6 p. m. and 7 a. m. The gateman lowers his gate on the approach of the trains of the Southern Railway and they are kept lowered until the Southern Railway trains pass and they are then raised. The gateman does not pay any attention to the street cars, does not signal the street cars, nor perform any service for the street railway other than the closing of the gates as above stated on the approach of the Southern

Railway trains. The conductors on the street cars do their own flagging—that is, they stop the cars at the Main street crossing. The conductor goes forward, looks up and down the tracks of the Southern Railway to see if a train is approaching, and signals the motorman accordingly. The conductors flag the street cars even if the gates are lowered when they stop at the crossing."

"The street cars begin running about 5:30 in the morning, and run until 11 to 11:30 at night."

"The Southern Railway did not consult the street railway as to the installation of gates, hiring of gateman, or amount of salary to be paid to him."

The plaintiff and defendant each moved for a direction of verdict in their favor. The presiding Judge directed a verdict for the plaintiff, and the defendant appealed.

I. The first question is, Is the contract void for want of consideration? There was sufficient consideration. It is true the plaintiff had only a right of way, and did not own the fee in the land. A right of way is valuable property. The use of this right of way by the defendant impeded the full enjoyment of this right, and to impose another right of way furnished a sufficient consideration. This point cannot be sustained.

II. The next assignment of error is that the presiding Judge erred in holding that the street car company is liable under the contract for the expense of keeping up the gate required by the ordinance. This must be sustained. According to the letter of the contract, the railroad company has no claim. According to the spirit of the contract, the railroad company cannot sustain its claim. It is manifest that the purpose of the contract was to provide joint payment of the expenses incurred by the two companies in their joint use of the crossing.

The agreed statement shows:

"The gateman does not pay any attention to the street

cars, does not signal the street cars, nor perform any service for the street railway other than the closing of the gates as above stated on the approach of the Southern Railway trains. The conductors on the street cars do their own flagging—that is, they stop the cars at the Main street crossing. The conductor goes forward, looks up and down the tracks of the Southern Railway to see if a train is approaching, and signals the motorman accordingly. The conductors flag the street cars even if the gates are lowered when they stop at the crossing."

The contract provides:

"That it will make and enforce a rule, binding upon all its employees, to the effect that cars of the Spartanburg Company shall in every instance be stopped before reaching the crossing of the tracks of the Southern Company, and that before the same are moved over such crossing the conductor in charge of each car shall first walk over such crossing, and, after ascertaining that the way is clear, signal accordingly to the motorman operating his car."

The gates are operated without any reference to the street car company, and it is not liable, either according to the letter or the spirit of the contract.

A verdict should have been directed for the defendant, and the judgment appealed from is reversed.

Mr. Chief Justice Gary and Mr. Justice Watts concur.

Mr. Justice Cothran (dissenting): Action upon a written contract entered into between the railway company and the predecessor in title of the defendant company, by which the railway claims that the defendant assumed one-half of the expense of maintaining protection to the public at a certain crossing in the city of Spartanburg.

There is no question but that the defendant company, which for convenience I shall hereafter refer to as the "street car company," is bound by the contract of its pre-

decessor in title, and I shall therefore treat it as having entered into the original agreement.

In the year 1900 the railway company crossed with its track Main street in the city; it of course had the easement of a right of way over the street at that place; the street car company was organized about that time, and proposed to lay its tracks in the center of Main street, and to cross the railroad track at the point where the latter crossed the street; in order to do this it was necessary that the street car company obtain the consent of the railroad company to cross its right of way, or to proceed to condemn that right, which even then could be exercised only under such precautionary conditions as might be required by the proper authorities; rather than attempting to secure this privilege in invitum, the street car company entered into the agreement in question, by which the right was accorded upon certain conditions: (1) That the material and appliances used should be of a specified character; (2) that its track and trolley should be constructed in a specified manner; (3) indemnity against certain accidents; (4) that it would require all cars to be stopped before reaching the crossing and the conductor to walk over the crossing to see that the way was clear from approaching trains; (5) "that, in the event that the city council of Spartanburg should at any time hereafter, by lawful ordinance, require the maintenance of electric lights and a flagman at said crossing of the tracks of the parties hereto, then the expense in that respect shall be borne by and equally divided between the parties hereto."

Thereafter the city council passed an ordinance requiring the railway company to erect, maintain, and operate at said crossing a suitable and proper gate for the protection of the public.

The railway company claimed that it had expended $2,160 during the last six years, the wages of a flagman at $30 per month, and that the defendant was indebted to it in one-half of that amount.

The contentions of the defendant were: (1) That there was no consideration for the contract; (2) that the agreement to pay one-half of the expense of maintaining "electric lights and a flagman" at the crossing did not cover the erection, maintenance, and operation of a suitable and proper gate for the protection of the public; (3) that the railway company had waived its right to insist upon reimbursement of one-half the expense.

I concur with Mr. Justice Fraser in holding that there was a sufficient consideration for the contract. The street car company had no absolute right to the passage over the railway company's right of way; the fact that it might have secured this right by condemnation does not affect a contract by which it was relieved of this necessity upon certain undertakings upon its part; the construction of a line of railroad across the track of the railway company was a superimposed easement and an additional source of peril, which it had the right to object to and to acquiesce in upon certain conditions.

But I do not concur in the conclusion that the maintenance of a gate for the protection of the public was neither within the letter nor spirit of the contract. I think that it was within both.

As to the matter of the contract: A crossing gate does not operate itself; there must be a human agency set there for that purpose; and I cannot see what difference it can possibly make whether that human agency performs the duty of flagging against an approaching train with a flag, a piece of cloth, or with a gate constructed of wood; the fact that he may be designated a "gateman" makes him none the less a "flagman," both being charged with the identical duty of flagging against an approaching train. Instead of a flag, a hand board with the word "stop" upon it is sometimes used; at night a red lantern. Is the employee any the less a flagman because he uses a board or a lantern

instead of a flag? If the effort of the railway company was to bill the street car company for one-half of the expense of erection, there might be some force in the attempted distinction.

As to the spirit of the contract: The leading opinion declares:

"It is manifest that the purpose of the contract was to provide joint payment of the expenses incurred by the two companies in this joint use of the crossing."

I see nothing in the contract that lends color to this suggestion. The purpose of the contract must be gauged by the situation of the railway company at that time and its situation after the car line crossed its track. It was then in no danger of having to respond in damages for a collision between one of its trains and a street car; the running of such cars across its track created that new danger, which it had the right to provide against. In view of the increased danger, it apprehended that the council would require it to adopt precautions to meet it. What could be fairer than that the company which created the increased peril should bear at least one-half of the cost of maintaining the preventative measures adopted "for the protection of the public?"

It seems to be suggested that the railway company is not within the spirit of the contract, for the reason that it operates the gates without reference to the street car company which flags its own cars. How could it operate the gate with reference to the street cars unless it constructed another gate parallel with Main street and stopped the railroad train upon the approach of a street car? This evidently was not intended, and is not suggested even in the ordinance. The fact that the street car company sends out its own flagman as a car approaches the crossing is in conformity with the express provisions of the contract; an additional safeguard which the railroad company had the right to insist

upon in view of the increased danger created by the street car company.

I cannot but think that the intention of the parties was that, in view of the then situation, of the increased peril to which the railroad company would be subjected by the construction of the car line across its track on the principal street of the city, and of the apprehension, that, owing to that increased peril created by the street car·line, the city council would require precautions of the railroad company, the street car company, in order to secure the privilege of crossing, would bear equally the expense of maintaining such precaution without interposing the quibbling defense that a gateman is not a flagman.

In *Merrill Co. v. U. S.,* 49 Ct. Cl. 553, it is said:

"In construing a contract the Court will ascertain the intention of the parties and to that end will, as far as possible, ascertain the situation of the parties, as well as the purposes had in view at the time the contract was entered into."

If there were a substantial difference between the salaries of a flagman, strictly so called, and a gateman, or between their respective duties and the purposes of their assignment, there might be some reason in a technical insistence upon the precise terms of the contract; but to hold that a man put at a crossing to warn against an approaching train by the waiving of a red flag or board with "stop" on it is par excellence and solely a flagman, and a man put at a gate to warn against an approaching train by the lowering of the gate is a gateman, and not a flagman, is a refinement which the purpose intended to be accomplished does not justify.